

FILED
99500

JAN 2 3 2024 MGP

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

GLORIA E. SWANSON )
)
Plaintiff, ) Civil No.
)
v. )
) 1:24-cv-585
ALPHA KAPPA ALPHA SORORITY, ALPHA ) Judge Robert W. Gettleman
KAPPA ALPHA EDUCATIONAL ) Magistrate Judge Jeannice W. Appenteng
ADVANCEMENT FOUNDATION, ) RANDOM CAT 2
ERIKA EVERETT, EXECUTIVE DIRECTOR OF )
EAF and BARBARA BROOKS, HR DIRECTOR, )
)
Defendant. )

## COMPLAINT

NOW COMES, Plaintiff, GLORIA E. SWANSON on her own behalf, as pro se plaintiff,

for her Complaint against Defendant ALPHA KAPPA ALPHA SORORITY, ALPHA KAPPA

ALPHA EDUCATIONAL ADVANCEMENT FOUNDATION, ERIKA EVERETT,

EXECUTIVE DIRECTOR, EAF and BARBARA BROOKS, HR DIRECTOR, (collectively and

hereinafter referred to as "AKA-EAF").

1.     Venue is proper in the Northern District of Illinois because the acts at issue were

perpetuated against Plaintiff, Gloria E. Swanson, (hereinafter referred to as "Swanson") who is a

resident of this district residing in Chicago, Illinois and all of the events or omissions giving rise

to these claims occurred in this district.  Plaintiff Swanson was employed by and terminated,

through a Constructive Discharge[1], by Defendant AKA-EAF in this district.

2.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §1331 in

that this is a civil action arising under the laws of the United States, specifically this Complaint is

---

[1] Constructive discharge, also known as constructive termination or constructive dismissal is a term used in
employment law when an employee resigns due to an intolerable work environment created by the employer.
Instead of directly terminating the employee, the employer chooses to create working conditions that are so
unbearable, or possibly even illegal, that the employee is induced to voluntarily quit their job.

made under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq and

discrimination and retaliation in violation of the Illinois Human Rights Act, 775 ILCS 5/101 et

seq (the "IHRA). The Civil Rights violations in this complaint involve disparate treatment and

disparate impact against Plaintiff Swanson under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 et seq.

3.      Defendant AKA-EAF is incorporated as a Washington, D.C. not-for-profit

corporation, but is headquartered in Chicago, Illinois, and conducts business in the State of

Illinois as well as maintaining chapters in various states throughout these United States in 10

separate geographic regions across the country created by AKA-EAF.

4.      Gloria E. Swanson (hereinafter referred to as "Plaintiff" and/or "Swanson") is a

resident of Chicago, County of Cook, Illinois.

### Exhaustion of Administrative Remedies

Swanson filed her EEOC Charge against AKA-EAF on July 11, 2023, waiting six months

for her telephone interview for her charge under Charge No. 440-2023-08155. On January 5,

2024, the U.S. Equal Opportunity Commission issued it's "Dismissal and Notice of Right to

Sue" to Swanson. Swanson is well within the 90 days with which to file her complaint from the

January 5, 2024 date of the EEOC's Notice of Right to Sue (Exh. 1). On September 5, 2023,

Swanson filed a complaint with the Illinois Department of Human Rights for which she has

received acknowledgement but no formal interview as yet. Swanson is appealing AKA-EAF's

denial of her unemployment benefits through and IDES Board of Review appeal because

although Swanson resigned her position, she was forced to resign due to AKA-EAF's toxic,

unbearable and harsh treatment of her in a constructive discharge. Plaintiff has fully complied

with all prerequisites to jurisdiction in this Court under Age Discrimination in Employment Act,

29 U.S.C. §§ 612 et seq ("ADEA")

## COUNT I

### DISCRIMINATION AND RETALIATION UNDER AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA"), 29 U.S.C. § 621 ET SEQ AND THE ILLINOIS HUMAN RIGHTS ACT, 775 ILCS 5/101 ET SEQ (THE "IHRA)

### INTRODUCTION

5.       Defendant, AKA-EAF hired Plaintiff, Swanson on October 5, 2022 as Executive

Assistant to Defendant, Erika Everett (hereinafter "Everett"), Executive Director of Alpha Kappa

Alpha Sorority's Educational Advancement Foundation ("AKA-EAF").

6.       Plaintiff, Swanson is a 74-year old woman with extensive experience with 45

years as a Legal Secretary in various law firms assisting senior partners and separate experience

as an Executive Assistant and office manager.

7.       Plaintiff Swanson began her duties as Executive Assistant to Everett on October

5, 2022 with just two weeks before a Directors' Conference in Dallas, Texas for newly-elected

EAF Directors.  Swanson agreed to attend the conference when she was hired.  Despite being

very new, Swanson jumped in with both feet, assisting with the compilation of the EAF Dallas

Conference books, assisted with tracking the flight arrangements for the EAF Directors to and

from the Dallas conference, coordinating with the organization's travel agent and interacting by

email and telephone with the conference participants, arranging for Car Service for the AKA-

EAF officers who warranted car service and scheduled the head shot photographs for the new

EAF Directors with the photographer.[2]  Officers at the conference introduced themselves to

Swanson and greeted Swanson with enthusiasm, one stating that she was glad to meet Swanson

---

[2] Swanson's performance assisting Everett at the October 17 through October 23, 2022 Dallas EAF Directors Conference was acknowledged and complimented in Everett's March 30, 2023 Core Values performance evaluation of Swanson by Everett (Exh. 2).

3

and that she could see Swanson's maturity, further stating that "Erika needs you and I hope you stay".[3]

8.      Upon Swanson's return to the AKA-EAF corporate offices after the Dallas Conference, she began learning and performing her duties. However, Swanson immediately began having problems with her computer, causing her to be under her desk, plugging and unplugging equipment to try to get the computer to operate properly as well as putting in tickets for assistance from the AKA-EAF outside technical support, Proven IT.

9.      However, in addition to Swanson's computer mysteriously malfunctioning, Everett began a campaign of singling Swanson out for unwarranted criticism while her younger staff never got reprimanded and sat around being unbusy. At times when Swanson had down time and asked about work or something to do, Everett ordered Swanson to "organize the office supply room" which Swanson did.

10.      Everett did not give Swanson very good instructions where Swanson had to get clarification on certain duties. Everett at times would say, "After I explain something to you once, I don't have time to explain it a second time." Then at other times, Everett would say, "Ask me if you don't understand something." When Swanson reminded Everett of her statements that she didn't have time to be asked about something for a second time, Everett then said, "That was only when I was busy." How was Swanson to know when she could ask a question and when she couldn't ask because Everett was busy? Then Everett would say to Swanson, "Am I moving too fast for you?" implying that Swanson was not able to keep up.

---

[3] Many of the AKA-EAF officers likely knew Everett's reputation for firing "older" Executive Assistants and preferring younger staff members, but also had likely heard of Everett's volatility towards her older Executive Assistants, thus stating that they hoped that Swanson stayed in the position..

4

11.     Swanson also believes that Everett sabotaged her computer to cause delays and make it appear that Swanson wasn't getting things completed in a timely manner and to discourage Swanson from continuing her employment at AKA-EAF. Swanson had to have the AKA-EAF outside IT service, Proven IT, look at her computer remotely a number of times to see what the issues were as to why Swanson was having so many problems with her computer. Then Everett forbid Swanson from calling Proven IT stating that it was costing her $75.00 for each IT call and that if anything happened with Swanson's computer, Swanson should come to Everett for help.[4] Swanson believes that Everett knew that if Proven IT looked at Swanson's computer, they would eventually figure out that Swanson's computer was being sabotaged or tampered with. Exhibit 3 shows photos of Swanson's computer equipment and computer which Proven IT asked Swanson to take pictures of when attempting to resolve Swanson's computer issues remotely.

12.     There were instances where Swanson would print and compose the Awards Certificates for the various Regional meetings and put Certificate holders on the Silver, Gold and Platinum Certificates for shipping to that particular region's conference hotel or venue site. Many times Swanson would get ahead and prepare the Certificates two weeks ahead of the actual conference, but have the certificates on top of her credenza. However, Swanson would always count the Certificates and match them against the original chapter lists for each Silver, Gold or Platinum category for that conference. Inevitably, when Swanson would recount the Certificates before packing them for shipping to the Conference site, there would be a Certificate "missing" which Swanson knew she had printed and placed in a Certificate holder. Swanson would go

---

[4] When Everett forbid Swanson to call Proven IT, the AKA-EAF outside tech company for assistance when Swanson's computer was breaking down, allegedly because it was costing Everett (AKA-EAF) $75.00 for each call, this was despite Everett stating to Swanson that EAF had $30 million much of which she, Everett, had been largely responsible for raising from members and events during her tenure as Executive Director of AKA-EAF.

back to her computer and reprint the Certificate. Everett or her minions may have thought that Swanson would just place the Certificates in the shipping box without recounting them, and then Swanson would be blamed for missing certificates when they arrived at their destinations. Swanson mentioned to Everett that there were a number of occasions where after leaving the Certificates on top of the file cabinet, a certificate would be missing and that someone was taking them off. Everett's response was "*Ain't nobody taking those certificates*" (emphasis added). Swanson had put post-it notes with the counts for each category of Certificate and would count and recount, but someone was sabotaging Swanson's efforts by removing a certificate out of the stacks.

13.    In early March, 2023, Everett out of the clear blue told Swanson she was tired of firing EA's and that they were all "older than her and thought they knew more than her". She added that "They don't like me and think that they know more than me and that I don't know anything." Swanson did not know who or what the circumstances of Everett's firing previous Executive Assistants was, but Swanson knew she was Everett's Executive Assistant and that she, Swanson, was also older, but she assured Everett that she (Swanson) did not dislike her and that Swanson respected Everett's knowledge. In that same conversation Everett told Swanson that she, Everett, thought Swanson was unhappy and that she thought Swanson would just leave. Swanson told Everett she was "not" (emphasis added) unhappy. At many points in the months between Swanson's hiring in October, 2022 and early March, 2023, when Swanson would try to communicate with Everett about issues, Everett would raise her voice very loud and make a statement that wasn't true. At one point when Swanson had been employed four months, Everett said, "You've been here eight months and you should know this." Swanson cut Everett off and

said, "I have not been here eight months. I've been here four months."[5] Everett would get very angry that Swanson cut her off and screamed, "You don't cut me off." Swanson stated that she cut Everett off because what Everett was stating was not the truth.

14. In other conversations with Everett, Everett falsely accused Swanson of not communicating with the other staff. The other staff were all much younger, one in his twenties, one barely thirty-one and another around forty-two. They acted as Everett's minions because Everett preferred a fiefdom of younger staff members that she totally controlled because their salaries were higher than they would likely make anywhere else so they kowtowed to Everett.

15. When Everett untruthfully accused Swanson of not communicating with the staff. Swanson told Everett that staff basically did not have much to say to Swanson and Swanson felt isolated, but had no basic problems with the EAF staff's silent treatment of her. Swanson initiated general conversations with the other staff about things going on in the city or local news, but other than good morning and good night, they had little to say to Swanson. Yet, Everett accused Swanson of not communicating with the staff. When Swanson told Everett that the staff did not talk to her, Everett said, "*Well, sometimes people's energy lets people know that they are unapproachable*." That contradicts Everett accusing Swanson of not communicating with the other staff and essentially admits that it was the staff that did not want to communicate with Swanson, allegedly because someone thought Swanson's energy signaled that Swanson was "unapproachable". As an aside, Swanson's friends tease her and say, "Gloria, you will talk to a

---

[5] More than coincidentally, when Everett turned up the toxic treatment forcing Swanson into a Constructive Discharge, Swanson's employment with AKA-EAF was at the 8-month point, as if Everett had been advised that the 8-month mark would be a good point to fire or force Swanson out, appearing that AKA-EAF gave Swanson a decent amount of time to prove herself. Everett had obviously had a slip of the tongue when she incorrectly told Swanson in February, 2023 at only the four-month employment point that Swanson had been there eight months.

doorknob." Swanson is friendly and strikes up conversations with even strangers maybe standing in line with her in a store and easily approaches people in job situations.

16.    Everett then told Swanson that she should have a meeting with each of the staff once a week for 30 minutes so they feel comfortable with her. If any of the staff said that Swanson was unfriendly, they were defending their positions of not assisting Swanson when Everett asked Swanson to ask various staff members for specific assistance. Everett's excuse for Swanson advising her of that issue was, *"Well, if I tell you to check with them on something or ask for their help and you just walk up to them and say 'Erika, told me to check with you about this . . . ', then they are probably busy and they can't help you with you just approaching them out of the blue. "* That was a Catch-22. Swanson asked in person and through emails for assistance that Everett instructed Swanson to ask for from the other staff members, Gregory Williams, Rachel Dixon, Antoinette "Niecy" James, and Schoquilla "Que" Coleman[6], but got assistance from them, if any, in their own sweet time. When Swanson conveyed something to the other staff that Everett asked Swanson to contact them about, Swanson was only doing her job, and Swanson's approach with the staff was always courteous and professional. That was a far cry and the opposite of Everett accusing "Swanson" of being "unapproachable".

17.    There was obvious inappropriate behavior or affairs going on in the EAF Department between EAF staff and other AKA employees, which Everett turned a blind eye to which may have contributed to the EAF staff's allegiance to Everett whether Everett was right or wrong and the staff's collusion with Everett in making Swanson's work life toxic and unbearable.

---

[6] Schoquilla "Que" Coleman was a newer employee, only starting approximately six weeks prior to Swanson's constructive discharge, and probably not yet being entrenched in Everett's collusive plan of separating Swanson from AKA-EAF.

18.     EAF staff member Antionette "Niecy" James stopped speaking to Swanson for over a month in collusion with Everett or because Swanson had told a mailroom employee (in the EAF Department in Antionette "Niecy" James' presence) that she had contacted him for days trying to ask for boxes for a conference shipment and he had not responded.[7] There was a strange relationship between "Niecy" and that gentleman where he would come up every morning and walk over to Antionette "Niecy" James' desk and bend over and "hug" Niecy. Everett turned a blind eye to that inappropriate behavior in an office setting so that "Niecy" was obviously beholding to Everett.[8]

19.     At one point when "Niecy" stopped speaking to Swanson even though Swanson had never said anything about what she observed between Niecy and Denham[9], Swanson finally went to Everett to tell her that Niecy had stopped speaking to her and that Swanson was not objecting if Niecy, who sat right behind Swanson, did not want to say good morning or good night to Swanson when she had been speaking to Swanson for the first four months of Swanson's employment, but that there came a time when Swanson asked Niecy a business question relating to a callback to an AKA member and Niecy totally ignored Swanson. With that Everett told Swanson that Niecy had complained to her that "*Gloria is always going around saying she is 74 years old and that she has been working for 55 years.*" Everett's response was "Just give her some time." Swanson had not done anything to Niecy other than tell Denham from the mailroom (who appeared to have a special relationship with Niecy) that Swanson had been trying

---

[7] Everett defended the mailroom person's slow response to Swanson's request for boxes to pack the conference shipments by saying, "Oh, he doesn't read emails; you have to call him". They then gave Swanson William Denham's cell phone number and told Swanson to call his cell when she needed him to do something. Whoever heard of an employee in an organization not checking and responding to emails.

[8] Antionette "Niecy" James also bowls with Everett outside of the AKA-EAF working relationship. Swanson does not bowl.

[9] Whatever relationship Antionette "Niecy" James and William Denham had was not Swanson's concern but Swanson was silently uncomfortable with Everett's allowance of that kind of unprofessional, inappropriate in-office behavior between two employees of AKA-EAF.

9

to contact him for days with no response to emails and that gentlemen was suddenly unjustly rushing Swanson about when the conference boxes needed to be out for shipment when he had not responded to Swanson's emails about bringing the boxes up. Yet, Everett was upholding Niecy in her age-related, unfounded statements about Swanson allegedly touting her age of 74.

20.    Swanson was not going around wearing her age on a sign on her back. Swanson mentioned her age in April of 2023 that she was going to be 74 when she had a birthday coming up and the over 50 years of working experience came up when Everett and the Staff member, Niecy, wanted Swanson to speak tersely to Sorority Members about a campaign for them to pay a fee to have their names inscribed on a 115th Anniversary Monument to be erected at Howard University. There was a lot of confusion and many members thought they could add more than one name for their $1,000 donation. Swanson wanted to explain the restrictions to the contributing members in a professional manner but Everett said Swanson should just be short with these people and Everett stated, "*They're not getting any money back*". Niecy echoed what Everett said about being short with the members who were confused about what they were getting for their $1,000 monument inscriptions. Swanson simply explained that she was always courteous over the phone and that was not the way in all her years of working that "she" would handle customers/clients/members in a phone call.[10]

---

[10] In speaking with AKA members regarding confusion concerning what they expected from their Monument donations, by talking a bit more to members than Everett envisioned, Swanson discovered many pertinent discrepancies when President Reed later asked Swanson specifically (while Everett was on vacation) to go through the list of hundreds of names to make sure that the name inscriptions would be correct since they could not be changed once inscribed. One member had sent her donation but the AKA list designated that member's chapter name and year as the name on the Monument instead of her own name. When Swanson called the member, that member's daughter answered and advised Swanson that her mother, the member, had passed away a few days after making her $1,000 donation and before her death had implored her daughter to double check to make sure that her credit card donation had gone through. She actually intended that her own name be on the Monument and "not" the name of her AKA sorority chapter as it had been erroneously listed. Swanson straightened that out and was deeply touched, knowing that her wanting to take a little extra time to explain and check the discrepancies on the AKA Monument list was more than worth the extra time because that donation by that member was basically her dying wish to have her own name inscribed on the 115th Anniversary Monument and not the chapter name. There were other discrepancies where a member's name was put on the list when that member was only making the credit card

99500

21.     In one office meeting, when Everett was browbeating Swanson about various things and twisting the actual facts, Swanson told Everett that she, Swanson, had always been professional with Everett. Swanson said, "I've always been professional with you, and I thought I was doing a good job according to your Core evaluation of me." Everett's response was, "*This is not about being professional. It's about you and me.*" Everett consistently acted like a bully in the streets and Swanson realized that Everett was on a campaign to run Swanson away from the organization or make Swanson's life so miserable and toxic that Swanson would be forced to resign in a constructive discharge or constructive termination where Everett would not be labeled with another firing of an older Executive Assistant.

22.     After Everett made the statement to Swanson that she was tired of firing EA's and that they all were older than her and thought they knew more than her and that they thought she didn't know anything and that they didn't like her, Swanson then decided to go to Human Resources.

23.     On March 13, 2023, Swanson called the HR Director, Barbara Brooks, and asked if she could speak with her in a meeting. Swanson met with Brooks and explained all of the events and treatment she was enduring from Everett. Swanson asked that Brooks not mention anything to Everett about her complaint because Swanson wanted to stay in the organization and was hoping that things would get better, but knew that she should advise HR about what was going on. However, although Swanson asked Brooks not to talk to Everett about her complaint, it was Brooks' duty to advise her superiors, Jacquelyn Young, Executive Director of AKA and/or AKA President, Danette Reed ("Madam Supreme"). Brooks obviously advised someone

---

payment for her "chapter's" name to appear on the list, and "not" her personal name that was on the list. These discrepancies warranted time to straighten out and not a short "You're only allowed one name for your $1,000" as Everett wanted Swanson to convey..

because although Swanson had never spoken with anyone internally about her toxic and harsh treatment by Everett, an employee on the AKA Sorority side told Swanson that she had started to ask for a transfer into the EAF Department, but her coworkers told her, "*No, you don't want to go in there because Erika (Everett) doesn't talk to Gloria right.*" At that point Swanson went ahead and told that sorority side employee what she had been enduring with Everett. Swanson wanted to remain in the organization and felt she brought a wealth of experience to assist Everett as a right-arm style of assistant, and Swanson did not want to be fired from the position. Swanson felt that if Everett knew that she had complained to HR about Everett's treatment of Swanson, Everett would fire Swanson or retaliate and treat Swanson worse.

24. Everett had a lot of power in AKA-EAF based on the amount of money she raised from events and members. At one point, Everett brought a page from an Excel sheet and just put it in front of Swanson at Swanson's desk pointing out what the EAF numbers and bank accounts were before she, Everett, became Executive Director of EAF and what it was currently in the years after Everett took the helm. At the point Everett showed Swanson this page in May, 2023, EAF had approximately $30 million which Everett attributed largely to her efforts. For Everett to show Swanson this page out of the blue, Swanson took this as Everett letting Swanson know that she had a lot of power due to her money-raising history with AKA-EAF and that she, Everett, would be at AKA-EAF for some time but that Swanson was dispensable and that Swanson's complaints about Everett's treatment of her would not carry any weight or consequences.

25. Two weeks after Swanson went to HR's Brooks about Everett's treatment of her, Everett called Swanson in for her Core Values Performance Review (Exh. 2). Everett then gave Swanson a stellar and exemplary written performance review, giving Swanson accolades

12

regarding her job performance. Swanson believes that the excellent review was Everett's attempt to discredit Swanson's allegations regarding Everett's disparate and toxic treatment of Swanson. However, the performance review was the actual truth about Swanson's performance of her duties without regard to the actual way Everett had been treating Swanson behind the closed doors of EAF.[11]

26.     For the next six weeks after Swanson went to HR Brooks about Everett's treatment of her, Everett did a 180 degree turn and started being civilized towards Swanson. While giving Swanson her evaluation, she stated that "You go above and beyond the call of duty", and she added that "Niecy is okay with you too. She (Niecy) said she doesn't have a problem with Ms. Gloria." That was in stark contrast to Niecy stopping speaking to Swanson for a couple of months and going to Everett with the statement that "*Gloria is always going around saying she is 74 years old and that she has been working for 55 years.*"

27.     At the end of April, 2023, HR's Brooks called Swanson into her office to ask about any updates on the situation with Everett. Swanson told Brooks that Everett had done a 180 degree turn for the better, where Swanson expressed that everything was much better and that Everett had done a 180 degree turnaround in her treatment of Swanson in addition to giving Swanson an excellent and stellar evaluation on March 30, 2023 (Exh. 2). Brooks said, "*And I'm just like I'm -I'm glad that she had a positive conversation, but if anything should change, please let me know because it's always on the table for us all (*emphasis added*) to have a conversation.*"[12]

---

[11] The AKA-EAF Department was behind closed doors in a separate section from the AKA Sorority team and no one heard or saw what went on in the EAF Department with Everett where her younger staff protected Everett's behavior to keep their jobs.

[12] This statement is evidenced in Brooks own words in an Illinois Unemployment Appeals telephone hearing which Swanson ordered the transcript of because AKA-EAF denied Swanson's unemployment benefits despite Everett forcing a constructive discharge and HR being advised of the hostile working conditions Swanson endured.

13

28.     However, after Swanson's report to HR's Brooks that Everett had made a turnaround for the better in her treatment of Swanson in late April, 2023, as early as the beginning of May, 2023, Everett resumed her bullying of Swanson and her hostile and toxic treatment of Swanson with another 180 degree turn this time for the worse as if once Swanson told HR's Brooks that everything was now better, Everett could turn the tables of her toxic treatment of Swanson again and no one would believe Swanson. Being the vengeful and retaliatory person that Everett is, she also told Swanson that she was 50 years old and not going to change, meaning no matter how she treated Swanson, she was not going to change and that she would be able to remain at AKA-EAF. So Everett began another campaign where Swanson could not do anything right for her. When Swanson brought it to Everett's attention that in the last couple of weeks, Swanson couldn't do anything right for Everett. Everett's response was, "Are you keeping track?"

29.     Swanson then realized that she needed to go back to HR's Brooks, but this time to put her complaints in writing about Everett's resumed hostile and toxic treatment aimed at forcing Swanson to resign without Everett having to fire Swanson.

30.     Therefore, on May 23, 2023, Swanson wrote a long email to HR's Brooks, letting her know that Everett's treatment of her had done another 180 degree turn for the worse and that this time she was putting it in writing. In that May 23, 2023 email and a string of emails between HR's Brooks and Swanson that went over into May 24, 2023 (Exh. 4), Swanson explained everything that Everett was doing to her. In those emails, HR's Brooks asked what had occurred to trigger the change in Everett for the worse. Swanson told Brooks that nothing transpired, but Everett just flipped a switch likely in delayed retaliation after Swanson initially went to HR on

14

99500

March 13, 2023 where Everett feigned better treatment of Swanson for about six weeks causing Swanson to report to Brooks in late April, 2023 that Everett had gotten much better.

31.     After Swanson reported Everett's returned toxic treatment and abuse in an email to HR's Brooks on May 23, 2023, Brooks suggested that Swanson have a talk/meeting with Everett for a "Fresh Start". Swanson responded that she was amenable to a Fresh Start meeting, thinking that Brooks' intention was a meeting of all parties, i.e., Brooks, Swanson and Everett. There was miscommunication because Swanson was expecting Brooks to follow through with her statement that "*And I'm just like I'm -I'm glad that she had a positive conversation, but if anything should change, please let me know because it's always on the table for us all (*emphasis added*) to have a conversation.*" (Unemployment Appeals Hearing Transcript. p. 12, Lns 25-27, p. 13, Ln. 1). This was Brooks' statement regarding the April, 2023 update which she spoke with Swanson about.     Swanson was expecting Brooks to set up a meeting among "all" of us, Brooks, Everett and Swanson. Why would Brooks send Swanson back in to schedule a meeting with Everett who hollered at Swanson for most of Swanson's employment, who stated that she was 50 years old and not going to change and who stated that "This is not about professionalism; this is about me and you."?

32.     On June 15, 2023, Everett held a staff meeting of the EAF Staff in preparation for their upcoming leadership conference and asked each of the staff about their progress in their tasks. Some of the staff members, Niecy and Rachel Dixon, stated that they did not have portions of what Everett asked them about but said they'd get it later from their desks. Everett was professional and responded to them in a pleasant tone. However, when Everett got to Swanson and asked about Swanson's task, she asked about very specific things like how many raffle gifts do we have. This was Swanson's first exposure to this particular conference, the

15

Leadership Conference, that involved allegedly as many as 12,000 members attending in Chicago in July, 2023. Swanson did not at that exact moment correlate the raffle gifts as being the donations of various contributors or vendors. When Swanson answered, "I don't know how many raffle gifts", Everett went into a loud and argumentative diatribe toward Swanson, saying, "You received these emails and you should know these things." Everett was so harsh in her tone for no apparent reason that Swanson asked, "*Am I being interrogated?*" since Everett had not spoken to the other staff in that tone and accepted the other staff members telling her that they didn't have certain portions of their updates on the Leadership Conference.

33.     Swanson took notes in the meeting and when the meeting was over Swanson returned to her desk. After lunch, Everett called Swanson into her office and started shouting, "If you don't like my style of management, THERE'S THE DOOR" (emphasis added). Everett then gave Swanson a "Notice of Disciplinary Action or Separation", stating that Swanson had disrespected Everett in the staff meeting.

34.     However, when Everett called Swanson into her office after that staff meeting on June 15, 2023, and began raising her voice and stating, "If you don't like my style of management, THERE'S THE DOOR (emphasis added), Everett accused Swanson of "disrespecting" her. However, Everett did not state what specifically Swanson had said that she viewed as "disrespect". Everett actually stated that another staff member in the meeting had called her aside after the staff meeting and said that "*Gloria disrespected you.*" Everett obviously did not perceive Swanson's response to her harsh and toxic questioning of Swanson in the staff meeting at the time they were spoken as being disrespectful. In actuality, Everett knew that she was the one being "disrespectful" and harsh towards Swanson. It wasn't until one of her minions called her aside and told her that Swanson was being disrespectful and Everett then

16

called Swanson into her office and began hollering and said, "*One of the other staff said that you were being disrespectful to me and if you don't like my style of management, there's the door.*"

35.     As to the Notice of Disciplinary Action (Exh. 5) which Everett gave to Swanson on June 15, 2023, despite Everett stating that it was only a "verbal" warning, but that Everett was putting it in writing to document it,[13] Everett falsely accused Swanson of disrespecting her in a staff meeting. The Notice of Disciplinary Action is in stark contrast to the glowing "performance Evaluation" (Exh. 2) Everett gave to Swanson on March 30, 2023. Everett harshly questioned Swanson with animus for no apparent reason when she had spoken civilly to the other staff members, some of whom did not have all of their answers in the June 15, 2023 staff meeting to the questions Everett had asked them, but they were treated amicably by Everett.

36.     Plaintiff Swanson realized that Everett had a reputation of firing her older Executive Assistants and therefore, many of them could have been drawing unemployment, so that Everett determined that she would make Swanson's life so miserable that Swanson would be forced into a "constructive discharge", i.e., quitting or resigning because the working environment was unbearable and Everett would not have to add to the number of older EA's she had fired.

37.     The last straw of the constructive discharge was on June 16, 2023 when Everett forced Swanson to move large boxes without help (Exh. 6), while making excuses of why the abled-bodied young men in the company could not help Swanson, one such young man being conveniently absent (William Denham) when he had promised to assist Swanson with moving

---

[13] Swanson does not know whether Everett took the Notice of Disciplinary Action or Separation to HR's Brooks or whether it was officially filed in Swanson's records or whether Everett presented the Notice to Swanson arbitrarily as an unofficial verbal warning in furtherance of Everett's tactics and toxic treatment to force Swanson into resigning in a Constructive Discharge. When Swanson included a copy of the Notice of Disciplinary Action with her Resignation email to Brooks, Brooks appeared to have had no previous knowledge of it but didn't indicate one way or the other.

the boxes on that date. Then when Swanson asked about help from the other young man in the mailroom (Charles), Everett said, "Oh, he can't help you. I saw him walking down the hall earlier and he has a brace on his leg." Many of the boxes weighed 25 and 30 pounds and more, but Swanson used her body to struggle with the boxes to lift them onto a flatbed dolly that was approximately three to four inches off the ground and then roll them to a cube area where they are pictured on Exhibit 7. Rather than strain her back at 74 years old[14], if Swanson were a dishonest person, she would have just laid out in the storage room, but Plaintiff Swanson is not dishonest. Some boxes had to be lifted onto the shelves in that cube which Swanson struggled with and placed on the credenzas in that cube.

38. Everett had ordered Swanson to clear out the storage closets (two storage rooms with boxes stacked over six-feet high) (Exh. 6) so that boxes of souvenirs and mementos not needed from previous conferences could be sent off to offsite storage. Everett's statement to Swanson was, "Greg (Gregory Williams) threw this stuff in here any kind of way over the years, but it's not his job to straighten it out.[15] It's 'your' job as my EA."

39. A couple of weeks after Everett's initial instruction to Swanson to clear out the two storage areas and move the boxes to a cube area right outside of EAF's department, further instructing Swanson to inventory the contents of the boxes which contained souvenirs of heavy ceramic cowboy boots and other various large items that were sold or given out at various AKA-EAF conferences. After the second week, Swanson was in the office supply room inside the EAF Department where Everett came inside with Gregory Williams and asked Swanson about

---

[14] Although in basically good health and in good physical condition, Swanson is 5'2" tall and weighs about 140 pounds at 74 years old.

[15] Gregory Williams is an EAF staff member who is a 20-something, 6 feet tall, at least 200 pound employee, but Everett stated that although Greg "had thrown this stuff in there any kind of way", it was not his job to move the boxes out and clear the storage rooms.

clearing the two storage rooms. Swanson told Everett that she had been in contact with William

Denham from the mailroom for help in moving the boxes because she didn't want to go in there

by herself and have something fall down on her head. Everett's response (while standing in the

presence of Gregory Williams, was "*Ain't nothing gon' fall on your head.*" (emphasis added).

Swanson then advised Everett that when Denham had come up a few weeks before to assist

Swanson with the boxes, while trying to get boxes down from the very top of the stack in one of

the storage closets, a box had come tumbling down towards Denham and Swanson where they

had to jump back from the entrance of the storage room to keep the box from hitting them. After

that first and only assistance from Denham which only removed a quarter of the very high

positioned boxes in one of the storage closets, Denham had continued for weeks after that to

promise Swanson he would come back up to help Swanson with the boxes, but would not appear

and continued to "reschedule" the help.[16]

40.     Everett obviously believed that Swanson might refuse to move the boxes, giving

Everett further reason to possibly accuse Swanson of disobeying an Order after she had given

Swanson the Notice of Disciplinary Action or Separation the day before, but Swanson moved the

boxes on June 16, 2023, had a very sore back, but did not refuse to move them. Everett had also

asked Swanson to document and inventory the boxes and Swanson made an inventory list of the

contents of the boxes, (giving that list to Everett on June 16, 2023) and labeled the boxes as such.

41.     Brooks stated to the Administrative Law Judge in Swanson's unemployment

appeal that she went on vacation and that Swanson never got back to her to advise her that

---

[16] Denham was infamously absent from his job on June 16, 2023, the last day that he had promised to come up to help Swanson move the boxes and the day which Everett pressured Swanson to go ahead and move and inventory the boxes without help. The second person in the mailroom which Swanson asked Everett if he could assist her that day was "Charles" and Everett said, "Oh, he can't help you. I saw him walking down the hall, and he has a brace on his leg." Obviously, this was all very conveniently planned to make Swanson move the boxes alone.

Swanson went in to speak with Everett one-on-one for a "Fresh Start" meeting. Why send Swanson into a situation with Everett who raised her voice at Swanson constantly and then lied and stated under oath in the Unemployment hearing that she never raised her voice at Swanson. What kind of constructive meeting could Swanson have had with Everett, one-on-one, when Everett had restarted the bullying and toxicity and when Everett had stated numerous times to Swanson that she was 50 years old and not going to change?

42.    Everett's rendition in the Illinois Department of Unemployment Hearing Appeal of why she thought and told Swanson that her EA's didn't like her and were older than her was testified to by Everett which was a blatant lie when she stated that Swanson had told her that she worked for large law firms and worked for "corner office" partners and that these partners were not likable people and that they treated Swanson badly, so Everett surmised from that alleged conversation that Swanson also did not like her. First, Swanson worked for Jenner & Block for eight (8) years, Baker & McKenzie for over five (5) years and Mayer Brown LLP for fourteen (14) years. Yes, Swanson worked for corner office partners because she has court reporting skills which the older partners preferred for faster dictation, but Everett and "Niecy" seemed to view Swanson's "corner office" reference as some kind of bragging. Swanson NEVER (emphasis added) had a discussion with Everett stating that Swanson didn't like her bosses or that her corner office bosses treated her mean. (IDES Trans. p. 41, Lns. 8-18)

43.    Swanson would not have stayed in any law firm for all of those years if she had been treated badly and those law firms would not have employed Swanson for those many years

20

had they been dissatisfied with Swanson.[17]  Swanson stated in the IDES hearing that this was a

blatant lie and that she did not like being lied on and could not defend a lie.

44.    When Swanson left work at AKA-EAF on that Friday, June 16, 2023, after all of

the toxic treatment and hollering from Everett along with the demand that Swanson move those

heavy boxes that day, Swanson made up her mind after the Juneteenth holiday (June 19, 2023)

that she would not get any assistance from HR's Brooks and that Everett had a lot of power in

the organization bringing money into the Educational Advancement Foundation with a fiefdom

of younger staff who would kowtow to her.

45.    Then Swanson wrote her 12 page email resignation on Tuesday, June 20, 2023,

emailing it to HR's Brooks (Exh 7).  Brooks was ironically on vacation so that when Swanson

did not receive a response to her email in a two or three hours, Swanson then redirected the email

to the AKA Executive Director, Jacquelyn Young and to President Danette Reed.

46.    If you check AKA-EAF's records and determine how many "older" Executive

Assistants Everett has fired in the past, you can see that Everett did not want to add another fired

Executive Assistant to her record, so Everett therefore set out to force Swanson to resign under a

constructive discharge toxicity. This is evidenced by earlier harsh browbeating by Everett to

Swanson where Everett told Swanson out of the clear blue in early March prior to Swanson

going to Brooks in HR that "She was tired of firing EA's and that they were all older than her,

and that they didn't like her and thought that they knew more than her simply by being older, and

that they thought she didn't know anything."

---

[17] Swanson's ex-bosses who are still alive can confirm that they respected her and she respected them and they have wonderful references and things to say about Swanson.  Everett's lie was the most ludicrous explanation of why she thought Swanson didn't like her.

## COUNT II

### CONSTRUCTIVE DISCHARGE, CONSTRUCTIVE TERMINATION

47.     Swanson realleges the foregoing paragraphs as though fully set forth herein.

48.     Swanson is a member of a protected class on the basis of age. She is 74 years of age.

49.     Swanson in all respects was performing her job in a manner that was consistent with AKA-EAF's legitimate business expectations.

50.     AKA-EAF discriminated against Swanson as described above, including but not limited to treating her in disparate treatment, and subjecting her to a hostile work environment causing her to resign under duress in a constructive discharge.

51.     AKA-EAF's actions were taken with a willful and wanton disregard of Swanson's rights under ADEA and the Illinois Department of Human Rights.

52.     As a direct and proximate result of said unlawful employment practices and in disregard of Swanson's rights and sensibilities, Swanson has suffered humiliation, lost wages, degradation, emotional distress and other consequential damages.

53.     "Effective organizational systems of bullying, toxic working environments and harassment prevention do not need to be designed from scratch. Effective anti-bullying mechanisms are rooted in organizational justice, transparency, and a focus on outcomes using valid instruments in decision making. They are supported by tools that facilitate inclusive, flexible work, voice and participation." HR under Brooks did nothing to intervene and have her superiors intervene. AKA-EAF functioned almost as a hazing cult, allowing Everett to be as abusive as she chose to Swanson. AKA-EAF hired a vendor out of Colorado called "Employers Edge" to assist them and coach them in lying to fight Swanson's unemployment. Swanson had to send her IDES Appeals responses and Board of Review Appeal to Employers' Edge and to

22

AKA-EAF. AKA-EAF functions as if their assets and money ($30 million according to Everett) allows them to ignore and defy the laws of age discrimination causing Swanson to endure severe mistreatment by Everett.

54.     Swanson has established a prima facie case of discrimination and retaliation. "Bullying is trauma and for most people, but documenting one's own trauma while it is happening when trying to maintain productivity is an impossible demand."

55.     In many cases bullying targets are told to just fix it/figure it out with the bully as when HR's Brooks stated in the transcript of the IDES Appeals telephone hearing that after Swanson's email complaint on May 23, 2023 in writing, during Swanson's cross-examination of Brooks in that hearing, Swanson asked, "*Did you intend that I go in there by myself and speak with her and set another meeting up with her and I, one on one?*" Brooks response was "*Yes*". This was a complete contradiction from Brooks testimony on pages 12 and 13 of the IDES Hearing Transcript where Brooks emphatically stated that "*It's always on the table for us ALL (emphasis added) to have a conversation.*" (IDES Trans. P. 12, Lns. 26-27, p. 13, Ln. 1) After the toxic and biased treatment by Everett resumed, it was Brooks duty to intervene, short of being derelict in her duties.

56.     Plaintiff Swanson has shown that she was subjected to intentional discrimination based on her age. Plaintiff Swanson is a member of a protected class, she was qualified for the job and performed the duties of her job efficiently, as evidenced by Everett's Core Values Performance review of Swanson on March 30, 2023. Swanson was subjected to adverse employment actions exposed to a toxic environment by Everett's bullying and disparate treatment of Swanson. Everett's giving to Swanson of an unwarranted Notice of Disciplinary Action or Separation on June 15, 2023 was the final push, along with requiring Swanson to move

large heavy boxes, that constituted a different term and condition of employment based upon a

discriminatory factor. Actionable harassment occurs "When the workplace is permeated with

'discriminatory intimidation, ridicule and insult (citation omitted) that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment. *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 20, 114 S.CT. 367, 371 (1993).

Everett's treatment of Swanson made the workplace hellish. Swanson's age motivated

Defendants' actions to force Swanson into a constructive discharge/termination so that Everett

would not be labeled with the firing of another of her older Executive Assistants.

## PRAYER FOR RELIF

WHEREFORE, Plaintiff Swanson prays that this Court:

A.      Enter judgment in favor of Swanson and against Defendant AKA-EAF for

violations of Swanson's Rights under Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 et seq

B.      Declare that the actions of Defendant AKA-EAF constituted unlawful

discrimination.

C.      Award Swanson compensatory damages in amount no less than $75,000.00,

including but not limited to lost wages in such an amount as will reasonably compensate her for

her losses associated with Swanson's emotional and physical duress[18] (Exh 8) caused by

Everett's harassment, toxic and disparate treatment and forced Constructive Discharge;

---

[18] Plaintiff Swanson left work at AKA-EAF on May 8, 2023 for a doctor's visit scheduled due to a persistent case of hoarseness with a feeling of general malaise after Everett resumed her bullying and toxic treatment in early May, 2023. Swanson's blood pressure was found very high and she was sent to the emergency room of Northwestern Medicine with a blood pressure of 204/97 where she was given medications to bring her blood pressure down. Swanson has taken daily blood pressure meds for over 25 years where her blood pressure is controlled, but suddenly Swanson's blood pressure raised on May 8, 2023 to stroke levels due to her duress at AKA-EAF. (Exh 8)

24

99500

     D.      Award Swanson such other and further relief as the Court deems equitable and

just.

## JURY DEMAND

     Plaintiff, Gloria E. Swanson hereby demands trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully submitted

Gloria E. Swanson, Plaintiff, pro se,

Dated: January 23, 2024

Gloria E. Swanson, Plaintiff pro se
8920 S. Chappel Avenue
Chicago, IL 60617-2919
Tele. No. 773-731-6014
Email: Gswanson8920@aol.com
99500 pro se

25

# APPENDIX

**Exhibit No.**

| | |
|---|---|
| EEOC Notice of Right to Sue, dated January 5, 2024 | 1 |
| Core Values Performance Evaluation, dated March 30, 2023 | 2 |
| Photos of Proven IT's Request for Pictures of Plaintiff Swanson's Computer | 3 |
| Emails of May 23,-May 24, 2023 from Swanson to AKA'S HR, Barbara Brooks | 4 |
| Notice of Disciplinary Action or Separation, dated June 15, 2023 | 5 |
| Photos of Boxes Swanson was forced to move on June 16, 2023 | 6 |
| 12-page Email Resignation under Duress of Swanson, dated June 20, 2023 | 7 |
| After Visit Summary for Gloria E. Swanson at Northwestern Medicine Emergency Room Visit on May 8, 2023 | 8 |

# EXHIBIT 1 - EEOC Notice of Right to Sue, dated January 5, 2024 - Swanson v AKA-EAF



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/05/2024

**To:** Ms. Gloria E. Swanson
8920 S. Chappel Ave
CHICAGO, IL 60617
Charge No: 440-2023-08155

EEOC Representative and email:     ROBERT WILK
Investigator
robert.wilk@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2023-08155.

On behalf of the Commission,

Digitally Signed By:Thomas Colclough
01/05/2024

Thomas Colclough
Acting District Director



**Cc: Alpha Kappa Alpha Sorority, Inc**
5656 S Stony Island 3rd Flr
JACKSON PARK, IL 60637

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you** *receive* **this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2023-08155 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Diane Smason, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2023-08155 to the District Director at Diane Smason, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# EXHIBIT 2 - Core Values Performance; Evaluation dated MARCH 30, 2023 -Swanson v AKA-EAF

Alpha Kappa Alpha
Educational Advancement Foundation, Inc.
5656 South Stony Island Avenue • Chicago, Illinois 60637-1906
800.653.6528 • Fax: 773.947.0277 • www.akaeaf.org



GLORIA SWANSON
Executive Assistant to the Executive Director

(O) 773-947-0059
Email: gswanson@akaeaf.net

Promoting Lifelong Learning



# CORE Values

Rating Scale:

Rating Description

EE        Exceeds Expectations – clearly and consistently exceeded many requirements

ME       Met Expectations – clearly met all requirements, or balance minor need for improvement in one area with exceptional

DM      Didn't Meet Expectations – clearly needs significant improvement in one or more areas to fully meet expectations

NA      Not Applicable – does not apply

---

**Reviewer Overall Summary:**

Gloria started with EAF in early October of 2022. She hit the ground running and has done a very good job in her new role as Executive Assistant. She attended the Fall 2022 EAF Board meeting with me in Dallas, Texas. This was a challenging meeting as it was the first of a new administration and completely new Board of Directors. The meetings ran smoothly and the feedback was positive on the planning and execution of the meeting. Gloria jumped right in from the completion of Board manuals that are provided to each member to ensuring that the attendees got to their photo sessions and meeting rooms and worked with hotel staff to ensure all menus were set on time and in accordance with the banquet orders. She also helped me maintain a calm presence throughout the meeting.

Gloria is working hard to keep up with the many moving parts that we manage on a day-to-day basis. She interacts professionally with all callers and is gaining familiarity with the EAF departments so she can filter calls to the proper individual. She will make an effort to understand the customer's needs to ensure they get their questions answered accurately and in a timely manner. Over time, she will come to fully understand the structure of our organization and how we work as a Foundation supporting students, our donors and Board and Regional Coordinators as they function as a board and on committees. Gloria has a wealth of experience to offer and as she learns more and goes through a full program cycle through July 2023 Leadership Seminar, the EAF Executive Office will continue to run efficiently and productively.

---

| Reviewer Overall Rating: | ME |
| --- | --- |
| Merit%: | 2% |


Exhibit 2



| Employee Printed Name:<br>Gloria E. Swanson | Date: Click or tap to enter a date. |
|---|---|
| Signature:<br><br> | Mar, 30, 2023 |
| Reviewer Printed Name:<br>Erika V. Everett | Date: Click or tap to enter a date. |
| Signature:<br><br> | 3/30/2023 |
| Executive Director Printed Name:<br>Erika V. Everett | Date: Click or tap to enter a date. |
| Signature:<br><br> | 3/30/2023 |
| President/CEO Printed Name:<br>Danette Anthony Reed | Date: Click or tap to enter a date. |
| Signature:<br><br> | |

**EXHIBIT 3 - Photos of Proven IT's Request for Pictures of Swanson's computer wiring and hook-ups - Swanson v AKA-EAF**







Exhibit 3





**EXHIBIT 4 - Emails of May 23, 2023 from Swanson to HR's Brooks regarding Everett's resumed toxic treatment - Swanson v AKA-EAF**

Re: [External] Update

From: Gswanson (gswanson8920@aol.com)

To: bbrooks@aka1908.com

Date: Tuesday, May 23, 2023 at 08:50 PM CDT

Thank you for your prompt response.

Nothing happened that I could see or that involved me that would trigger the change. It seemed that Erika held herself down shortly after my first talk with you. I didn't think anyone had spoken with her, but President Reed may have given me some accolades relating to a project I did for her while Erika was on vacation and which President Reed came to our department and asked me personally to handle, maybe due to Erika being on vacation.

Erika also assigned me as "Staff Assignments" to handle the VSG's (Very special guests) during the Leadership Seminar in July. I volunteered for something else in our EAF Staff meeting, and Erika said, "No, Gloria, I'm reserving you for something else." And that something else was partnering with President Reed's Protocol, Tracey Washington and one of the Regional Coordinators to handle the VSG's. I am honored to do it.

It made me wonder if President Reed had requested that I be in that spot during Leadership. As stated, I had gone over the 115th Anniversary AKA Monument Excel sheets with a fine-tooth comb for President Reed to make sure that the names were correct, as well as advising people who had their names or titles included (which were not allowed) or people who had more than one name for their initial $1,000 donation. President Reed has thanked me several times when she's been in for helping them with that. Most of that work was done while Erika was on vacation in Paris.

In any event, sometimes it seems like Erika turns a "switch" on or off that affects her personality and again, nothing occurred between she and I to trigger a change. I don't know whether someone spoke with her about my talk with you because she did the 180 degree change when she returned from vacation (I thought she had gotten some rest). When she returned from vacation, she said that she had no problems with me and that I do what she asks and more (above and beyond the call of duty), but previously, she had said the opposite, i.e., that I should only do what she asked because she was on a deadline and that I was not following instructions by doing more. I was simply trying to check and inform people of what they should be informed of and then President Reed ultimately asked me to do exactly that.

Exhibit 4

It wasn't until President Reed came along and asked me to "do" the very thing that Erika had said I shouldn't have gone above and beyond what she initially asked for but then again, President Reed had set a deadline for what she wanted, and I suppose Erika felt she didn't want me to make the extra calls or that I didn't have time to call the individuals and let them know that they could not have their Dr. or Esq. titles, etc. on the Monument, when it ultimately had to be addressed anyway. And some of that was what President Reed asked me to do stating that once those names are etched, it will be too late and so President Reed wanted to make sure people knew how their names would appear on the Monument so that no one would be upset.

So I don't know what triggered the change in Erika. Today, she was fine. I told her I needed to contact ProveIt or have someone look at my computer because my pdf documents were still coming through as Word document and then asking me if I wanted to convert them to pdf and then the document would be skewed and disjointed. Erika sent me a Teams message saying she would come to my desk and help with my computer setting. She showed me where to go to change the default setting back in an app and she was calm and pleasant. I told her I would not have known to look there or that changing that setting was the problem and asked how did it get changed? She said she had to look up how to do it and who stated further who knows how it changed.

I also told Erika during our meeting yesterday that I did not "dislike" her and that I am not "unhappy", but she continued to attribute a feeling to me that I am not feeling, nor have I exhibited anything anywhere near feeling that way. When I told her that I have been professional with her at all times, she said, "This has nothing to do with 'professional'. This is you and me." I guess she meant whether we get along, but as far as I'm concerned, I am getting along with her, but no adult wants to be hollered at and chastised for every little thing.

I don't have time to dislike anyone, and if Erika continues to paint me as being "unhappy", then what? It appears that she wants it to look like I'm so unhappy at AKA-EAF and, according to her, I don't like her, so then what are my options? I told her I was not unhappy, and that I do not dislike her, but I don't like to be hollered at when she could tell me what she has to say or correct and clarify what she wants in a normal tone, but she stated that she was 50 years old and wasn't going to change and when I expressed again the way her voice raises and the way she speaks to me, she said, "That's the way I sound, and I'm 50 years old and not going to change."

As an aside, she had a conversation with one of our investment people over the phone and even though her door was closed, she was hollering at that man so loud, our whole department could hear every word. If she was defending her position on something that was misunderstood between the investment people and her, then it still was way off kilter to be hollering at that tone in a professional conversation regardless of whether there was disagreement between them. As I said, it's like a switch goes on and off pertaining to her mood and her interaction . . . with me at least.

Again, I do not care to be pushed into quitting if that is Erika's objective in saying that I am unhappy and that I do not like her. I am doing as good a job as anyone could under the circumstances and so I am taking this day-by-day and want to continue with my position.

While I probably should not have walked away from Erika's doorway, I came to the door to ask a simple question and she went into this barrage of why didn't I earlier look for the email. Walking away from her door could be construed as disrespectful, but by the same token, I felt I was the victim and being unnecessarily abused where I couldn't stand in Erika's doorway and be subjected to that abuse any longer.

Erika later admitted and apologized for not making herself clear by admitting that she should have said "email" and not letter, but conversely said that I should have thought to search the emails or put the emails in folders in Outlook, but again, she asked for a letter and I checked the source that I recalled at the moment. The moving parts of these events are a lot to retain and at the moment, I didn't recall that emails were sent also, so I went to the quickest manner where I could confirm that the gentleman had received a letter. That would have been done in less than 10 minutes, but through no fault of my own, my computer went haywire like gremlins. With that, I don't want to be talked to like I'm a fool when I ask a question a second time or need clarification.

Thank you for getting back to me.

I will continue to keep you posted.

Gloria

Gloria E. Swanson
8920 S. Chappel Avenue
Chicago, IL 60617
773-731-6014
FAX: 773-731-0391
Gswanson8920@aol.com

-----Original Message-----
From: Barbara Brooks <bbrooks@aka1908.com>
To: Gswanson <gswanson8920@aol.com>
Sent: Tue, May 23, 2023 3:37 pm
Subject: RE: [External] Update

Good afternoon Gloria,

3

Can you tell me, in your opinion, what has transpired over the last few weeks to change the working relationship? When I followed up with you last to see how things were going between you and Erika, you told me everything had turned around and was going really well. I am just wondering if there was anything specific, that you are aware of, that may have prompted this turnaround.

Thanks, I appreciate you keeping me in the loop. You say that Erika has made comments or said you dislike her or that you aren't happy here. Have you set the record straight to let her know this is not the case and in that meeting did you share your concerns with her with the way in which you are stating she is speaking to you?

Your message says this is an update and that you don't want me to speak with Erika; however, I also don't want this situation to progress in an unproductive manner either. If there is anything that I can do to support the both of you, I would like to do that.

My recommendation would be that you schedule a time to sit down with her to meet and discuss how best you all can work better together. Something similar to a "Starting Fresh" meeting to discuss:

- How she wants things done
- What support you need in order to be successful
- Communication – clear details on what is being asked, how it's communicated, and you having the ability to ask questions, as needed

Let me know your thoughts on this approach.

Please keep me posted of the situation and if things don't improve, please let me know ASAP.

Regards,

Barb Brooks, PHR, SHRM-CP
Director of Human Resources
Alpha Kappa Alpha Sorority, Inc.
www.aka1908.com

**From:** Gswanson <gswanson8920@aol.com>
**Sent:** Tuesday, May 23, 2023 12:47 PM
**To:** Barbara Brooks <bbrooks@aka1908.com>
**Subject:** [External] Update

Hi Barb:

I am putting this in writing this time because it has started again and escalated in the last couple of weeks. It seems that I can do nothing right for Erika or if she has to refresh my recollection twice on how to do something or what to do, after I am tasked with a myriad of simultaneous, sometimes unclear instructions, she gets frustrated.

Very minor things are taken to the point of almost hollering the instructions or responding like I've committed some terrible error. Her voice goes way up to

4

antagonistic heights and her tone and facial expressions are almost angry. This is so unnecessary.

Yesterday, she asked me to check to see if a sponsor had been sent a sponsor letter for a Leadership donation. I checked my physical letters, found his letter and began to scan it in to email the "letter" to Erika, confirming that the gentleman received the letter. The letter was also in the electronic file, but I found the physical letter quicker.

Unfortunately, something started happening with my scanned document (had never acted that way before) and instead of a pdf, although the tag said pdf, the document was showing as a "Word" document and wanting to convert the scanned letter.

I wrestled with why my computer was doing that, shut my computer down and asked for Rachel's help as to why it was doing that . I finally got the document to show up as a pdf so that I could attach it to an email.

Later that afternoon, I asked a separate question standing at Erika's door and she went into why I had to scan the document and get Rachel's help when I could have gotten the email. At the time, I didn't recall that we sent both a physical letter and an email. If Erika had asked for the "email" to the gentleman, I would have searched my emails. She then went into a diatribe saying, "It shouldn't have taken more than 10 minutes for you to find the email, and I wouldn't have given you the task if it was going to take more than 10 minutes." I asked "Am I being timed?"

Frankly, since all of this "can't do anything right" began last week, as I was standing in the door, I could no longer deal with the lambasting so I walked away. That perturbed Erika and she sent me a "Team's message" asking me to come into her office.

I came in, closed the door and she immediately began telling me to never walk away from her and that it was disrespectful. I told her that every interaction with me is way up to the top when a simple correction would suffice. I told her that if she had said "Email", I would have looked for an email, but she said "letter". I actually sent the email also to the gentleman in March, but in learning and doing in an atmosphere where Erika often states that she "moves fast", I try to get things checked off and did not recall offhand that I sent physical letters in addition to an email. I'm still going through the process of learning these different aspects for each conference and this is my first "leadership seminar" that we are currently preparing for.

5

We continued to talk and Erika says something that is not true and I interject which she resents, asking me to let her talk. What my main concern now is that she's stating that "You don't like me, and you don't like my style of working." First of all, Barbara, I do not dislike Erika and I have told her that I didn't and would never dislike her when she made that statement a few months ago. I do not like the way she raises her voice when talking to someone and explaining or correcting a minor thing that she makes into a major production to make it appear that I am not learning, difficult to train or have to be told something twice. She mentioned again yesterday that she's too busy to have to tell someone something twice! I do not profess to retain every word and instruction when they're coming at me, in her own words, from her "moving fast".

I have asked to check with Provelt when I had computer problems. For a while, there seemed to be a dead zone, Internet-wise, for my computer but it has somewhat straightened out. But recently when my computer acted weird and I wanted to call Provelt, Erika said, "No" because she quoted what they charge her for each call. Every company or office usually has a "Help Desk" or someone an employee can go to for IT assistance. I am not a tech person and should not have to figure out computer serious problems. Erika told me to come and ask her for the help on the computer, but then she complains that she's so busy that she doesn't even have the time to have to tell me something twice, so I am getting incongruous and mixed messages.

Then she did apologize for not being clear when I reiterated that she asked if I had a "letter" to this gentleman. I also apologized for walking away and said I did not mean it in a tone of disrespect but that I was worn down due to the "can't do anything right" that's been going on for over a week and that it seems if I say "black", she says "white" aura going on. And she talks so loud that everyone can hear so I told her that it seems that she's setting the stage for something, to make it appear that I can't handle the job or that she has to tell me things over and over.

She then said in our closed-door talk (which can be heard outside of the closed door) that she wasn't setting the stage for anything and that if she wanted to "fire" me, she'd do it now. I don't understand. I don't want to be accused of "not liking" her when I have never exhibited any conduct towards her that would indicate that I do not like her. No one wants to be basically hollered at when something is being explained or when someone is making it look like you're a dunce when they haven't explained properly or misstated the instruction due to misleading words or statements.

6

Again, I do not "Dislike Erika" and I have a problem with her making those kinds of statements, i.e., "You don't like me". She's telling me how I feel which is untrue. At another time, a few months ago, before I came to you initially, she said, "I don't know why these EA's don't like me. They're older than me and they think they know more than me or that I don't know anything." Well, although that time she didn't single me out specifically as "not liking her", I am an EA, and I am older, but, again, I have never been anything but professional and respectful of Erika. However, yesterday, I could not stand in that doorway and have her hollering at me and chastising me in an arguing fashion about my scanning a letter instead of sending her the email, which she later admitted that she did not clarify or make herself clear. So that is when I walked away because that kind of treatment is toxic and bordering abuse.

Erika's explanation is that that is the way she sounds and she stated further that she's 50 and is not going to change. People cannot holler and argue with people for simple corrections or mistakes. And some of the chastising is not a mistake, but the fact that I was given incongruous instructions.

I don't know what else to say. Erika also said that "You seem to be unhappy and if that's the case, maybe you should do something else." And then I told her that I've worked for some of the most difficult and powerful law firm partners and never had this kind of problem. Then she turned that around and said, "Maybe you're taking out on me what those lawyers put you through." I told her I was at various firms working for these difficult partners for 5, 8 and 14 years at three different major firms, so that I obviously was not stressed to the point of leaving by staying that long and I certainly wasn't taking anything out on Erika. My point was that I was able to handle these personalities and get their work done without being stressed, in spite of speaking up for myself if things went awry and these partners respected me and never took any of my responses personally.

For the record, I am not "unhappy", but if Erika keeps making statements like "You are unhappy and 'you' don't like me", I have a problem with that because those things are not true.

So after the meeting, I handled a few more tasks and went on with my normal day. We said "Good night" at the end of the day as usual, but I thought I'd let you know because beginning last week, it seemed that she is lambasting me for every little thing that I do. I think I am doing as good a job as anyone in this position could do. This protocol and sequence of conferences and preparation for same involves a lot of steps, and Erika has been here long enough to know those steps like the back of her hand, but she expects me to retain every twist and turn of events without having to ask twice. When I told Erika it seemed that in the last

7

few weeks, I can do nothing right for her, she said, "Are you keeping track?" I said, "Yes, when I am the victim."

I take notes as fast as I can on pertinent things, and as an aside, I took notes on the staff assignments for Leadership in an April EAF staff meeting, but suddenly could not locate my notes which should have been on my desk. I specifically recall writing certain people's names down for specific assignments, but couldn't find them.

Of course, I got jumped on about that and was asked by Erika, "Are you having problems taking notes?" So I went to the individual staff members and asked them what they volunteered for. I said then that for the next EAF staff meeting, I will bring my court reporting machine and take the notes verbatim where they are not sitting on a note pad or where they cannot be misplaced and I can transcribe them verbatim.

I do not dislike Erika, and I am not unhappy. If any of this is designed to discourage me or encourage me to leave, then I just don't know what to say. I am pleased with AKA-EAF and want to continue in my position out without drama. And, again, I do not want anything said about this to Erika, but wanted my side of the story documented in case it was presented differently. Just an update.

Thank you.


Gloria Swanson

Gloria E. Swanson
8920 S. Chappel Avenue
Chicago, IL  60617
773-731-6014
FAX:  773-731-0391
Gswanson8920@aol.com

# EXHIBIT 5 - NOTICE OF DISCIPLINARY ACTION, JUNE 15, 2023 - Swanson v AKA-EAF

**AKAEAF Corporate Office**

# Notice of Disciplinary Action or Separation

| EMPLOYEE NAME (Last, First, M.I.) | POSITION | DEPARTMENT |
|---|---|---|
| Swanson, Gloria | Executive Assistant | Executive |

| SUPERVISOR'S NAME (Print) | SCHEDULE/SHIFT (Include times if possible) | LOCATION |
|---|---|---|
| Erika V. Everett | | |

| HIRE DATE | SEPARATION DATE, LAST DAY WORKED | DATE OF MEETING/COUNSELLING |
|---|---|---|
| October 5, 2022 | | June 15, 2023 |

### ACTION TAKEN (PLACE X IN APPROPIATE BOX/BOXES)

| | | |
|---|---|---|
| ✓ VERBAL WARNING | WRITTEN WARNING | FINAL WARNING |
| SUSPENSION | VOLUNTARY RESIGNATION | TERMINATION/DISCHARGE |

### REASON FOR ACTION (CHECK ALL THAT APPLY)

| | |
|---|---|
| ATTENDANCE/TARDINESS | INABILITY TO PERFORM JOB DUTIES (NO MISCONDUCT) |
| VIOLATION OF POLICY/PROCEDURE | NEGLECT OF DUTIES/RESPONSIBILITIES |
| VIOLATION OF DRUG/ALCH. POLICY | THEFT/MISAPPROPRIATION OF CO. PROPERTY/FUNDS |
| INSUBORDINATION | ✓ OTHER (PLEASE DESCRIBE) |
| INAPPROPRIATE BEHAVIOR/CONDUCT | Inappropriate, rude response to ED in Staff meeting. |

**DESCRIPTION:** *EXPLAIN IN DETAIL THE FACTS OR EVENTS OF THE VIOLATION, INCLUDING THE TIME(S) OF INCIDENT(S), WHICH REQUIRE CORRECTIVE ACTION. USE THE BACK OF THIS FORM IF NEEDED.*

During EAF staff meeting held on June 15, 2023 at 10:00 am, when Gloria was asked by the Executive Director about raffle items, she responded inappropriately on two (2) occasions. First, she said that she was being "interrogated," when she was being asked about her work just as other staff are asked questions. Second, she stated that "she doesn't know which raffle prizes were committed to EAF and that I should know."

The Executive Director then responded that Gloria received notices of the raffle prizes directly by the donors and after a few seconds of additional commentary, Gloria admitted that she received the emails, but offered no viable explanation as to why she had not retained the information. The ED went on to remind her that we went over the prizes during morning meetings, at which time Gloria found the sheet with the information and wrote notes on her Leadership checklist copy.

This meeting is to issue the verbal warning and reiterate ways that can help Gloria stay on top of all of information and data that is constantly received. The suggestions have been to print emails as soon as received and take action right way by adding the information to checklist/morning meeting agenda or checklist, along with placing the hard copy printout with the current checklist and agenda to ensure it will get addressed and listed in real time.

There was also a reiteration of current tasks, such as taking inventory of the storage area so items that are not needed in the immediate future are prepped to be sent to offsite storage, versus items needed during the upcoming conference, versus items that can be purged or shredded. The ED asked that the inventory be done first so it can be reviewed with further instructions given after review.

Gloria needs to work on her communication and tone when speaking to her direct supervisor. She needs to read over her notes and after taking action/updating files, read over that again and get clarity when she does not understand her notes or the instructions given. She also needs to work on her organizational skills and have an excellent grasp of the different moving parts and all components within.

Areas for improvement will be addressed in Gloria's goals for 2023.

Exhibit 5

**AKAEAF Corporate Office**

*...Continued from reverse*

| FAILURE TO | CORRECTIVE ACTION TO BE TAKEN IF NO IMPROVEMENT IS MADE |

This is documentation of a verbal warning.

FAILURE TO ACHIEVE IMMEDIATE AND SUSTAINED IMPROVEMENT/CORRECTION TO THE BEHAVIOR OR ACTIONS DESCRIBED ABOVE MAY RESULT IN FURTHER DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION.

| PREVIOUS | HAS THE EMPLOYEE BEEN PREVIOUSLY COUNSELED/DISCIPLINED? |

✓ NO          YES     *IF YES, CHECK ONE OF THE BOXES BELOW AND LIST THE DATE(S) OF THE WARNINGS.*

**VERBAL     DATES:**

**WRITTEN     DATES:**

| EMPLOYEE | IN CASE OF RESIGNATION, ASK EMPLOYEE TO STATE EFFECTIVE DATE AND REASON IN THIS SECTION |

BY SIGNING THIS DOCUMENT YOU ACKNOWLEDGE BOTH ITS RECEIPT AND YOUR UNDERSTANDING OF ITS CONTENTS.

**EMPLOYEE'S SIGNATURE**

**DATE**

**SUPERVISOR'S SIGNATURE AND TITLE**

**DATE**

6/15/2023

DISTRIBUTION: PLACE IN EMPLOYEE'S PERSONNEL FILE & COPY TO EMPLOYEE

Feb 2020

# EXHIBIT 6 - PHOTOS OF BOXES SWANSON WAS FORCED TO MOVE ON JUNE 16, 2023 - Swanson v AKA-EAF





# EXHIBIT 7 - 12-page Email Resignation Under Duress - Swanson v AKA-EAF

Gloria Swanson - Resignation as Executive Assistant to EAF Executive Director

From: Gswanson (gswanson8920@aol.com)

To: bbrooks@aka1908.com

Date: Tuesday, June 20, 2023 at 08:18 AM CDT

Hi Barb:

It is with reluctance and a heavy heart that I must resign my position as Executive Assistant to EAF Executive Director, Erika Everett. I apologize for not giving Notice, but I can no longer endure the bullying, verbal abuse and toxic atmosphere that is heaped upon me by Erika Everett

Please see the attached Resignation Memo and other documents and photos.

Gloria E. Swanson

Gloria E. Swanson
8920 S. Chappel Avenue
Chicago, IL 60617
773-731-6014
FAX: 773-731-0391
Gswanson8920@aol.com

 Nts of disciplinary Action or Separation Gloria Swanson.pdf
1.7MB

 EAF first storage mostly emptied and moved.jpg
3MB

 EAF Storage room 2nd.jpg
2.8MB

 Resignation Gloria Swanson.pdf
11.1MB

 EAF cube area where GS moved boxes on flat dolly.jpg
2.7MB



TO:        Barbara Brooks, AKA-EAF Human Resources

FROM:      Gloria E. Swanson

DATE:      June 20, 2023

RE:        Resignation Under Duress of Executive Assistant to EAF Executive Director

Hi Barbara:

With a heavy heart (in more ways than one) I am advising that I am immediately resigning my position as Executive Assistant to EAF Executive Director, Erika Everett. While I have never resigned from a position without giving "notice", I can no longer endure the verbal abuse and toxicity of working for Erika Everett. My first thought was that I would never leave the position prior to the Leadership Seminar in order to give them the assistance that I can as the Executive Assistant.

However, on Thursday afternoon, June 15, 2023, after our EAF Staff meeting that morning, Erika called me into her office and closed the door. She stated that I had "disrespected" her in front of staff and that one staff member had called her aside after the meeting mentioning it.

My response was "the staff are on your side because you have other relationships with them (she bowls with Antoinette "Niecy" James and Gregory Williams[1]). She then stated that the staff that mentioned my statements to her were not people she had any relationships with.

Erika proceeded to misdescribe a dialogue we'd had in the meeting which she inaccurately labeled as disrespecting her in front of staff. It started with her asking me a series of questions in a harsh tone that she was not speaking to the others with. I did not have the answers to the questions she was barking at me, but answered as best I could. Then I said, "Is this an 'interrogation'?" It was obvious that Erika was coming at me in an antagonistic manner with a tone filled with animus for no apparent reason.

Then later in the meeting when she questioned others about their tasks and whether they had completed certain things or whether they had the data documents with them in the meeting and the answer was "no", she had not spoken to them in the tone she spoke to me in and she simply told them okay, bring it such and such a time.

When Erika got back to me for a second set of questions, while I'm taking minutes for the meeting, she started again with the harsh tone in questioning, asking "What other gifts do we have for the **raffle**?" I said, "I don't know. You tell me." She got very perturbed and said, "You

---

[1]  While superiors/supervisors have gone to special occasion events with subordinates, it appears wholly inappropriate for an Executive Director to have ongoing, regularly scheduled "bowling" events with subordinates who likely joined the bowling team with the ED in order to curry favor in their job positions. The entire department kowtows to Erika, agrees with everything she says, right or wrong, and seems to want to continually placate her regardless of her unprofessional management style.

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 2

received an email from Hilton regarding the two nights stay" and you know this." Frankly, I did not know that that specific gift was for a "raffle". She then said, "That doesn't make any sense. What else would it be for?" If anybody was being disrespected in tone and accusations, it was Erika disrespecting me. Last year, they even had a silent auction which they are not having this year and while I knew that, I have not gone through the Leadership Seminar process completely to know that these specific gifts are for a raffle only. When Erika speaks to me in a harsh tone, I give her my response and it may come out in a tone in kind because of the manner in which she has spoken to me. But in discussing it on Thursday, "Notice of Disciplinary Action or Separation" meeting, whenever I tried to explain my position, Erika said I was being "defensive".

Erika does not want me to disagree with her whether she is right or wrong and I have interrupted her statements when they are not true because I am not allowing anyone to "Lie" on me, which makes Erika tremendously mad and she starts telling me, "You don't cut me off. Let me talk." And I simply say, "I'm interrupting because what you're saying is not the truth."

Long story, short in our meeting at around 4:30 p.m. on Thursday, June 15, 2023, Erika gave me a "Notice of Disciplinary Action or Separation" stating it was a "verbal warning", although she was documenting it in writing. Her rendition of what transpired, i.e., that I admitted in the meeting that I had "received" the email from the entity donating the hotel stays, that did not automatically mean that I was to know from Osmosis that the particular donation was going to be raffled off.

Erika told me I could sign the Notice or not, but that she would sign and that I had better not disrespect her in front of staff again. She further stated in an unprofessional "street manner", that "If you don't like the way I do things, THERE'S THE DOOR." I just sat there and looked at her, and when I mentioned my heart was heavy in more ways than one in my earlier paragraph, when I left out of Erika's office, the whole left side of my chest was burning. I told her I chose not to sign that Notice.

Erika has given me incongruous instructions on a number of things. One Sponsor who contributed for two patron tables at the Leadership conference had two different company names that they were emailing us under. While I gave them the invoice they requested with both names on the invoice, I asked Erika which name I should put on their "table tents". She responded, "Put both of them on."

Therefore, I made two table tents (which seemed appropriate since they had purchased two tables), but when I showed the drafts to Erika, she said, "No, not two names." She then said "Call them and ask which name they want." I brought this inconsistent instruction up to her in our one-on-one meeting where she basically told me "There's the door." She then said she meant that I should put "both" names on one table tent. How would I know that when she simply said put both of them on?

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 3

In fact, both names were very long so that the graphic designer's space for the Sponsor name was not long enough for both names, but I got blamed for not knowing that she meant "put both names on the same table tent" when they would not have fit anyway.

Erika does not instruct well, and she also asked me in our one-on-one, "Am I going too fast for you?, as if to peg me as some slow, docile individual who can't keep up?" In answer to that question, I told her, "No, you're not going too fast for me, but you do speak very fast and you don't explain yourself."

She talked about us working on our "Communication", but I am very clear while one minute she'll say if you don't understand ask, and then when I do ask, she says she's too busy to have someone asking her something twice. When I brought that incongruity to her attention a few months ago, she said, "I meant I'm too busy at times to answer something twice." How do I know which times those are?

I have been lied on in the description in this Notice of Disciplinary Action and as for the "staff", they will go along with anything Erika says obviously to keep their jobs, short of being subpoenaed for the truth.

Erika also unfairly and untruthfully accused me of not communicating with the staff. Barbara, this is the farthest thing from the truth. I told Erika in this meeting on Thursday that the staff basically do not have anything to say to me, and I feel isolated. I initiate conversations with them about something going on in the city or otherwise, but other than good morning and good night, they have little to say to me, but I am being accused of not communicating with them. When I told Erika that, she said, "Well, sometimes people's energy lets people know that they are unapproachable." I am one of the friendliest people in the world. My friends tease me and say, "Gloria, you will talk to a doorknob." I strike up conversations with strangers maybe standing in line with me in a store and easily approach people in job situations.

Erika now says I should have a meeting with each of the staff once a week for 30 minutes so they feel comfortable with me! If anyone has said that I am unfriendly, they are defending their positions of not assisting me when Erika asks me to ask them for specific assistance. Erika's excuse for that is, "Well, if I tell you to check with them on something or ask for their help and you just walk up to them and say "Erika, told me to check with you about this . . .", then they are probably busy and they can't help you with you just approaching them out of the blue." Barbara, that is a Catch-22. When I convey something to the other staff that Erika asked me to contact them about, I am only doing my job, and that approach is certainly courteous and professional. Erika also accused me of being "unapproachable" which is the biggest lie in the world and if the other staff have said that to Erika, they are lying.

I asked Erika if she had had this conversation with any of the other staff about "communication". I asked this because I do not have a communication problem. I can't help it if the other staff don't wish to strike up conversations with me, but I certainly come to them with any requests that Erika directs that I contact them about with professionalism and courtesy. However, I

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 4

should not have been wrongly singled out regarding an untruthful allegation relating to "communication" so I asked if everyone had been spoken with about communication. Erika first said "yes" and then caught herself and said, "No, that's none of your business", again in her bullying and harsh tone.

I have been nothing but friendly and pleasant with everyone. I even invited the new EAF employee to my home for a barbeque on Memorial Day because she is new to the city and I figured she might not have anyone to share the holiday with. "Que" accepted my invitation and came to my Memorial Day barbeque and I thought she enjoyed herself. So, if I am outgoing and welcoming enough to invite the newer person to my home, then how am I being accused of being "unapproachable".

Erika even printed out a page from the Internet on "How to deal with 'unapproachable' people" and brought it to my desk on Friday. I do not like someone trying to label me as something I am the farthest rendition of. Anybody who's known me throughout my life, work wise or personally, would laugh anyone out of the room who accused me of giving off "energy" that makes people view me as "unapproachable". Anyone on the AKA side of the third floor knows that I am friendly and speak and strike up conversations with them in the lunchroom or in the bathrooms.

And on that note, although I asked that Erika not be approached about my initial contact with HR regarding my earlier complaints about her, I later learned from an AKA side employee that she thought about transferring into the EAF department because we had two open positions, but that other employees in AKA had told her, "No, you don't want to go in there because Erika doesn't talk to Gloria right."

Nobody was supposed to know this because I certainly had not mentioned it to anyone inhouse, but after that AKA employee said that, I then told her about my issues with Erika's verbal abuse and her obvious efforts to run me away. And true to form, Erika has retaliated against me so she obviously knows that I spoke with HR. She has also mentioned again on Friday that I disrespected her by walking away from her. Again, I said, "I did not need to stand in that doorway and let you continue to verbally abuse me so I walked away."

When Erika told me a few months ago that she was not going to fire any more EA's and that she was "tired of firing EA's", that signals that she has fired a number of her assistants and likely no one can do anything right for her or she feels threatened by the career talents of others. I certainly do not want her job, but something is seriously wrong with her unwarranted treatment of me. So, obviously, since Erika does not want to "fire any more EA's" to avoid it appearing that she is the problem, she is obviously on a campaign to make me quit . . . and she has succeeded! I have never had a job in over 50 years where someone treated and talked to me so horribly.

Erika complained about something that I put down incorrectly from taking handwritten notes of our EAF meeting. She speaks very rapidly and cuts herself off with other thoughts. So I decided to bring my court reporting Stenograph machine for the next staff meeting (May 25, 2023) to

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 5

take verbatim notes which I did. I had 8 pages of typed notes, but had a problem with the ink on my Stenograph sometimes not picking up some of the numbers or words and then it smoothed out as I had re-inked it earlier, but the ink took a while to set completely around the spool since the machine had sat dormant where the ink had dried out.

In any event, on Thursday, May 25, 2023, I brought my notes home and while I started transcribing the notes at work, I knew I wasn't going to be able to complete them, so I completed them from home that evening and was up until 1:00 a.m. That Friday morning, May 26, I was going on vacation after Memorial Day so that Friday was my last day in the office until I returned from vacation on Monday, June 5, and it was important to me to have the Minutes completed before I left.

When I returned from vacation, Que asked if she could tag along with me for lunch and I said, yes. While at lunch, she told me that Erika had asked her to redo my minutes in a succinct form so when I got back that Monday, June 5, for our morning meeting, Erika had chopped up my 8 pages of Minutes and said," This is too much detail. I don't need all of this. You can keep this information for yourself, but you need to learn to make the minutes succinct because I had used the word "succinct" in telling her that it's difficult for me to write succinctly when I thought the details were important, but that I would make them shorter.

When Que redid the Minutes, she had things like "Discussed leadership seminar" or discussed "raffle gifts", without any detail about anything that was discussed. Her redoing of my Minutes reduced my minutes to one page from 8 pages and I felt that my efforts were shot down and unappreciated, so I took my Stenograph home and decided to go back to taking minutes by hand because Erika said she needed me to be engaged in the meeting and when taking court reporting notes, I explained to her that while my fingers are getting it down, I am essentially only hearing words coming at me and cannot focus on what is being said until I complete the transcription of the notes. I looked at the chopped up version of my minutes and simply figured anything I do is not good enough for Erika in her campaign to run me away.

Then since the reference to the "other gifts" that Erika had barked at me about in the Thursday, June 15, 2023 staff meeting were in my original minutes, Erika came to me on Friday and showed me my original minutes and said, "See, you have that in your minutes. You're supposed to read them." I responded telling her about the holiday, the company closing early that Friday, and my vacation occurring right after I completed the minutes, and that when I returned from vacation, with going through a week's worth of emails and her giving me other tasks and her asking about other things, I had not had the opportunity to read my notes that she had shot down and where she literally took a pen and crossed out 90% of what I had taken down.

I mentioned to Erika that Que's rendition of my minutes were so succinct that they told nothing about what transpired in the meeting where she took the notes on June 1, 2023 when I was on vacation and I stated, "Why take notes if there's not going to be real information about what transpired." Erika then said she told Que about that or mentioned that they were too succinct.

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 6

The incongruity continued and therefore, I cannot come back into that toxic and anxiety-inducing atmosphere under Erika.

Erika wanted me to clear out the two storage closets we have on the other side of the bathroom and stated that since she didn't have an EA, Greg had just been "throwing" stuff in there any kind of way, but that it was NOT his job! Those closets were stacked to the front and back and stacked at least five (5) feet high. It's a dichotomy for Erika to ask me to clear the boxes as a senior woman, and say that a younger man had put the items into the storage closest any kind of way while she did not have an EA, but that it was not his job but my job as EA to straighten those storage rooms out. Did that statement involve me running the risk of something falling on me?

I looked at the boxes and after a couple of days when Erika asked me about it, I told her that I wasn't going to go in there and have something fall down on my head and that I had called William from the mailroom to help move the boxes over to the two cubes outside of the EAF Department. Erika initially said once the boxes were moved there, I could get Greg to look at them with me and determine what could be archived and what we needed to keep for use during the upcoming leadership seminar.

William finally came up after a couple of days and helped move some of the boxes to the cubes, but Greg was not keen on coming out to go over what was in them with me, so that is when Erika defended Greg and said, "Well, he could be busy and can't just do that because you approach him with it." I would not know what they might use or what needs to go to offsite storage without Greg's or Erika's help. Erika also asked me on Thursday if I had "inventoried" the boxes and that she'd told me to write a list and give it to her. She had not instructed any such thing about inventorying.

Erika told me to get the boxes out of storage to the two cubes outside EAF's back door and get Greg to help me with what should be sent to offsite storage and what should stay for the Leadership seminar. Erika got out in the open and starts asking "Did you inventory these boxes?" as if to have an audience out in the open. She'd never asked that I inventory them. I was to get them to the two cubes and have Greg go over them with me but Greg was not available to go over the things that Williams had moved to the first cube. Plus, I would have had to get up in those storage closets where again, I'd risk something falling on me. Plus, William and others who could have and should have helped me get the boxes moved or checked over for their content, were conveniently absent, injured or too busy.

Erika and Greg were in our department's supply coffee room and Erika asked about the boxes again, and I told her William had moved some of them, but that I was reluctant to go in and have a box or boxes fall down and hit me in the head. Erika's response was, "Ain't no box gon' fall and hit you in the head." I said, "Well, a box did fall." Greg's mouth flew open and I said, "It didn't hit me in the head, but a box came falling down while William was moving the boxes and we both were standing at the outside edge of the storage closets so it didn't hit us, but as boxes

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 7

were moved out, we would have stepped deeper into the closet and that same box came from higher up.

So, on Friday, June 16, 2023, Erika started railing about the boxes and I had asked William on Thursday to pick a time when he could come and help move the remainder of the boxes. William told me he would be able to help me on Friday. So when I told Erika on Friday that William was supposed to come up and help me that day, she said, "He's not here. He's off." Very convenient! Then I said, "Well, maybe Charles can help me." Then Erika said, "Oh, I saw Charles walking down the hall with a brace on his knee so he can't help you." When I saw Charles, he was walking as well as anyone, short of having a brace on his knee/leg.

Barbara, Erika and her cronies have made a concerted effort to sabotage my ability to be successful in this position, along with Erika being verbally abusive and creating a toxic environment for me.

Another incongruous instruction was that three of the Board members/Regional Coordinators booked their own flights independently for Leadership before we instructed them in late March to use our Travel agent, DirectTravel. Of course, they advised us (Leslie Daniel, Crystal Lander and Arla Bentley) and asked if and how they would be reimbursed. Erika instructed me to advise them to send receipts of their airfare and that amount would be reimbursed by adding it to their "per diems". When I gathered the receipts and was instructed to make a sheet for Greg regarding these reimbursements, when I put reimbursement on the Expense or check requests to Greg and emailed it to him, I always copy Erika on everything, but she complained again saying I should not have put the word "reimbursement" and just put "per diem" without any reference to "reimbursement".

Erika's initial instructions to me were to advise the ladies that they would be "reimbursed" by adding their airfares to their per diem. I don't understand why it was "error" for me to use the word "reimbursement" when I sent the request to Gregg. Again, there's a complaint about everything, even when I was instructed by Erika using certain terms, and then she changes in midstream and makes it appear that I have gotten something wrong. If you research those emails to those ladies, of which Erika received an email cc, the word "reimbursement" is used and the ladies asked about reimbursement.

On another occasion last week, Erika sent me an email that was directed to Karla Hall, the EAF Treasurer where Erika was scheduled to have a Zoom call with her later that evening and said the documents were for that call. The strange thing about it is that these were confidential documents with highly sensitive information in them, including the three highest paid staff of EAF. My name was nowhere on the email that contained these documents. For the cc, it had Karla Hall's name again. I emailed Erika and asked, "Did you intend to send these documents to me or did you need them printed?" But somehow that email came to my email also with no rationale explanation of why I should have received those sensitive documents.

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 8

Erika responded back that no, she did not need them printed but that she had included me in the email because she wanted me to know where we are with receiving them, the Treasurer's Report for the Board Meeting, Budget Finance & Investment Report for the Board Meeting, Treasurer's Report for the Annual Report and Treasurer's Report for the Annual Members Meeting. I, of course, had started printing the documents, but then asked why I had received them. When Erika said she did not need them printed, I took them to the large Shredder Bin in the back storage/file room and dropped them in. I could not see the need to see these documents or have them attached when they could have simply been described, as she did, without me seeing them.

One of the documents was a state filing which had the three (3) highest salaries of the EAF staff. I really believe that Erika wanted me to see the salaries of herself and two others, thinking that maybe I would get upset about what others were making. When I take a position and accept the salary I am offered, I do not worry about what anyone else is making because I "accepted" my offered salary regardless of what others make!

Then when going over "Smart Goals" on Friday, June 16, 2023, with Erika, she discounted all of the "Smart goals" I had prepared from an example she sent by email and said that a form had been developed and they wanted the Smart goals to conform to the form. Therefore, the examples she had given in the email example around June 8, 2023 and which I predicated my responses on were very different from the Smart Goal outline on the form. I did not mind conforming my initial responses to the newly developed form, but Erika began to cut down my responses while comparing them to the new form. When I tried to explain that my responses were based on the email of 5 or 6 examples she had given, she discounted that and said the email was just an example. Well, the new form had not been presented so we had no comparison yet to what was going to ultimately be expected.

I had mentioned in my rendition of the Goal examples Erika emailed me that I was "honored" to be chosen to assist with the VSG's (Very Special Guests). She then said, "The only reason you were chosen to assist with the VSG's is that you're the only one that knows these people." How untrue is that? President Reed's protocol, Traci Washington, will certainly "know who these people are" far better than I would. And it's safe to say that the EAF staff who have been in their positions for from five to eight years would certainly know "who these VSG's are. Other than the AKA-EAF officers, I would not know who would be VSG's.

Then Erika told me in the Friday Goals meeting that "You heard me say I had a conference call at 2:30 and when they told you that the lunch (pizza) was being delayed to 2:45 p.m. on Thursday, "You didn't come in and ask me if I wanted you to get me something, and that all of the food could have been gone by the time I got off my call."

I told Erika I didn't know she expected me to be responsible for her meals. I was struggling with those boxes (copies attached) on Thursday when the pizza was supposed to come, and I didn't switch gears and know from Osmosis that Erika expected me to "ask" her if she wanted me to get her something. She also mentioned that all the other staff when going out to lunch will stop and ask her if she wants them to bring her something, but that "you" don't do that. I told her I

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 9

always go out and eat alone for the most part and have pretty much done that all of my life. It's no reflection on anyone. In previous positions in law firms and other places I've worked, I got my bosses coffee and filled a silver coffee pot for one boss every morning for 5-1/2 years, but was told about all of that when I started.

Because the other staff want to keep their jobs and kowtow to Erika, they offer to get her lunch, but she said that as her EA, I am supposed to be concerned about her and represent her. I understand representing her and have done that in a professional manner, but she said that offering to get her lunch because I allegedly knew she had not eaten is just human. As I said, I go out for walks and walk to 53rd Street and chose different restaurants to eat and sit down and relax. I did this while working downtown for 50 years, and did not know that I'm supposed to know that Erika has not eaten and look out for her eating!

Also, when HR sends a notice about getting time in, I immediately make sure my time is updated. On a number of occasions when I know that I have put my time in and checked "Approved", the next day, Erika will say my time isn't completed. How difficult is it to put in 8.00 hours and check an approved box? But in some way, my boxes may end up unchecked or something is missing, making it appear to HR that I am not sufficiently getting my time in. On our Thursday meeting, Erika mentioned HR's notice about getting the time in early. I asked in our staff meeting whether I could check off the "Approved" box for Friday even though Friday had not arrived. Erika said, yes. I went back to my desk and did that, looking at the 8:00 hour entries and looking at the Approved boxes, one by one to make sure they were properly checked. Suddenly on Friday, two of my entries were missing and Erika called me to her office to look at her screen of what was showing up for my time on her screen. There were a couple of days missing entries at the end which I know I filled out. I had so much trouble with my computer early in my employment, I don't know whether the time screen is showing as accepting the entries and properly saving them or whether they are being tampered with.

I then asked Erika to come to my desk to look at my screen because I knew I entered that time, especially when she confirmed that I could fill in the Friday time early and check it approved even though it wasn't Friday when I entered it. I asked about that in our EAF staff meeting on Thursday and came back and immediately entered the time. When we looked at my screen, the time was not there.

Erika came out to where I was unloading the boxes from a little portable flatbed dolly that we have in our office so that other people in the area heard her asking me about the time. Granted, I may have missed checking off "Approved" on one day on occasion by being in a hurry, but after being brought to my attention, I certainly double check. There is no way that after I check and double check that these entries should suddenly be missing.

As an aside to the VSG assignment, President Reed's protocol, Traci Washington, sent an email to me asking about the categories of the "table tents" and asked for a list. I sent them to her initially in a return email. Traci said she had one correction and that was that the AKA Directors were not to be designated as "The Directorate" and that they only use that term for "internal"

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 10

references to the "Board of Directors". In my directory booklets and in the table tents that I was told to reference that were made by a previous EA for previous conferences/Seminars, the term "Directorate" was used. I appreciated Traci telling me about the internal designations, but Erika had not ever explained that to me, but told me to look at the box of previous table tents and duplicate those! But when I bring that kind of thing to Erika's attention, she pooh-pooh's her mistakes off or says, "You're supposed to know this. You have this information." And recently in the last couple of months, she created an "Executive Assistance", three or four page document and told me to read it. She has since asked me, "Have you read the EA guidelines that I gave you? I told her, "Yes, I have read it." However, I can read what she wrote 15 times as to what the EA is responsible for, but that still does not explain the exact protocol and caveats of the structure of what's to be done at Leadership and any other conference, i.e., the Fall Meeting, until I go through that event. That document is an "overview" of general EA duties and does not detail the steps necessary in preparation for the various seminars/conferences throughout the year.

So, since Erika stated she was not going to fire anymore EA's, and since it appears that her objective was to make me leave the organization so that she wouldn't have to fire me, she has accomplished her goal, and I leave reluctantly. However, Erika may be opening up a can of worms, trying to be malicious and lying to make it appear that she is moving too fast for me (without truly instructing me) or that I can't learn. She lied or incorrectly stated when I was in the position for three months that I'd been there for 8 months.

Maybe 8 months was the magic number where she would either fire me or cause me to have no choice but to resign to escape the toxic and verbal abuse. And it's ironic that this month, June, is my 8th month where as a seemingly planned timeline, Erika has now given me the Notice of Disciplinary Action or Separation.

As I've previously explained to you, there is and was nothing to trigger a change in Erika's abusive tone and attitude towards me when it again reared its ugly head. I don't know if Erika has other "issues" which, as a lay person, I have no idea of what initiates them, other than that they are often unwarranted and unfairly directed at me. Incongruously, she gave me a glowing evaluation in March/April and said she had no problems with me. Now, it appears that she was biding time until possibly 8 months.

After Erika had started her earlier campaign and returned from vacation, she did a 180 in terms of her criticizing and harsh tone with me, but reverted back to the abuse after a few weeks. It's also unfortunate that the other EAF staff function like robots in agreeing with everything Erika says and does to stay in good graces with her, and in this case, that could have very well meant assisting her in running me away from my employment with AKA-EAF.

Again, I apologize for not giving notice, but the thought of coming back into that department runs my blood pressure up. As I said, I have never been treated like this in my entire working career. I wish everyone well, but no one could come in with no knowledge regarding EAF's operations and structure and do any better than I did. I told Erika that learning all of the structure

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 11

and protocol of each function is like learning the Constitution which would not happen over night with its caveats. When those officers in Dallas told me that they were glad to see me and that "Erika needs you", they likely know that she has a reputation of not knowing how to treat or talk to certain people or feels threatened or insecure, and they told me they could see the "maturity" in me, maybe in the sense that Erika might not intimidate me as quickly as she would someone less mature, but no one wants to be treated like a dog.

And Erika told me a few months ago when she said she wasn't firing anymore EA's, she further stated that "I don't know why these EA's don't like me. They're older than me and they think they know more than me or that 'I don't know anything'". I told her that I didn't dislike her and that I would never think that she doesn't know anything, but nothing works with her because she has issues that I will not try to interpret.

I have to be concerned about my own health and wellbeing regarding someone who would callously send me into a storage room stacked to the rafters, taller than I am, instead of allowing more able-bodied people to assist me. My family has noticed my anxiety and angst regarding my EA position under Erika.

What if something had fallen on me and I ended up laid out in one of those storage rooms? And after William moved some of the boxes out of the first storage room, and I was instructed to go back and complete it after William was conveniently off on Friday, I had to lift boxes onto the little flatbed dolly which had to be lifted at least 3 inches to get them onto the flatbed, but then they had to be unloaded into the cube area on the desk and on the floor which I struggled with.

Although Erika told me to try not to lift anything too heavy, I am still a senior woman and many of those items were more than 25 pounds which I used my body to maneuver. I guess Erika expected that I would refuse to do the lifting and she'd have a charge of my refusing to do something, especially when I told her I had to get William's help the first time because something could fall and hit me in my head. And those boxes were, as Erika had told me, thrown in there any kind of way, with a folding table on top of 5 feet of boxes.

Greg came by on Thursday and asked me if I needed some help AFTER I had pretty much unloaded everything left in the first storage closet (photo attached) except for the heavier items. I lifted torn boxes of heavy Ceramic cowboy boots and used my body to maneuver them onto the little flatbed, but they were heavy. When Greg came at the end and asked if I needed some help with the second storage closet (photo of items stacked up high), I told him I was not going to tackle the second closet because my back was hurting and I'd do it next week.

If with the next EA Erika employs, there is an ongoing pattern of toxicity and a history of firing EA's, it is a foregone conclusion that everyone else cannot be at fault in this pattern of bullying and verbal abuse. And my thought is that Erika wants an EA who kisses up to her outside of the workplace and the EAF duties, yet she states that she wants an EA that is an expression of herself. I don't bowl.

Resignation Memo to HR
From: Gloria E. Swanson
June 20, 2023
Page 12

If her desire is to have someone who is an expression of her, it should involve a person that thinks, is proactive and has been instructed properly on what to do, not someone who should know exactly what to do through osmosis, simply from being there. Erika often mentions how many years she has worked at AKA-EAF so she knows the procedures for these various events, but does not properly explain them.

Erika has also told me that her job is to bring in the money for EAF, as if to imply that because she does bring in money, that her position is solidified due to her fundraising and that I will be the one to leave. So, Erika has accomplished her objective. I am resigning! I also believe that may be why she sent me the confidential documents where I was not on the email, that was directed to the Treasurer, Karla Hall, so that I could see her salary (Erika's salary) and others' salary to possibly think that I would leave if I'm low on the totem pole salary wise. I know that others have been in EAF longer than me and earned their salaries over the years when I recently started, and as I said, when I accepted my salary, I am not bothered or interested in what others in the EAF department make.

After I didn't react about seeing Erika's and others' salaries, Plan B was obviously to force me to move the boxes, on the assumption that I might refuse, have William conveniently absent and Charles walking around with a leg brace. In addition, Erika began lambasting me about "inventorying boxes" which she had never mentioned. She had led me to believe Greg would help me sort what needed to be done with the boxes. I ultimately inventoried the boxes that evening, writing down the names of the labeled boxes and going into the boxes that were not labeled to ascertain what they contained and making large 8-1/2 x 11 labels to designate their content. I then typed a list of all of the boxes moved to the two cubes, all of the boxes left in the first storage area and any boxes or items I could see at the super stacked second storage area (photos).

Then as the coupe de gras, Erika jumps all over me about not "offering" to bring her food from the pizza lunch that was brought in stating that I had "heard" her say she was going to be on a call at 2:30 and that when I was told the food would not come at the initial 2:15, but at 2:45, I should have automatically offered to get her food because all the food might have been all gone by the time she got off of the call, all these presumptions while Erika has me struggling with moving those boxes.

Erika left me no choice but to leave without notice to avoid her further abuse.

Thank you.

*Gloria E. Swanson*

Gloria E. Swanson

P.S. I will return my office entry key fob by mail directed to your attention, Barb.

**EXHIBIT 8 - AFTER VISIT SUMMARY from NORTHWESTERN MEDICINE EMERGENCY ROOM for SWANSON'S MAY 8, 2023 EMERGENCY ROOM VISIT - Swanson v AKA-EAF**

# AFTER VISIT SUMMARY



**Northwestern Medicine®**

**Gloria E. Swanson** MRN: 007362096

📅 5/8/2023  📍 NM Emergency Medicine 312-926-5188

## Instructions

 You were seen in the emergency department and assessed for life threatening causes of your symptoms. You should follow up with your primary care provider. We have provided an ENT referral so they can scope you and assess the function of your vocal cords.

---

OTOLARYNGOLOGY (ENT) REFERRAL
Specialty: **Otolaryngology**
Status: **Authorized**
Expires: **5/8/2024 (requested)**
To schedule, please call us :
Downtown Chicago Locations :312-695-8182
Northern Suburb Locations :847-535-6464
Western Suburb (Winfield) : 630-938-6161
Western Suburb (Geneva) : 630-938-3900
Western Suburb (Sycamore): 815-758-8106
NU Center Audiology Speech Language and Learning (Evanston): 312-695-8182

## Today's Visit

You were seen by Aaron Robert Quarles, MD

Diagnosis
**Hoarseness**

⚕ Medications Given
amLODIPine (NORVASC) Last given at 8:21 PM

iohexoL (OMNIPAQUE-350) Last given at 9:16 PM

Blood Pressure
**204/97**

Temperature (Oral)
**98.3 °F**

Pulse
**55**

Respiration
**18**

Oxygen Saturation
**92%**

## MyNM
View your After Visit Summary and more online at https://mynm.nm.org/MyChart/.

---

Gloria E. Swanson (MRN: 007362096) • Printed at 5/8/2023  9:42 PM

Page 1 of 4  **Epic**

Exhibit 8